**UNITED STATES of America,
Appellee,**

v.

**David J. MILLER, Defendant-Appellant.**

**No. 463, Docket 30465.**

United States Court of Appeals
Second Circuit.

Argued June 22, 1966.

Decided Oct. 13, 1966.

Marvin M. Karpatkin and Osmond K. Fraenkel, New York City (Henry M. diSuvero, Nanette Dembitz, Rhoda H. Karpatkin, Carl Rachlin, Melvin L. Wulf, Alan H. Levine, New York City, on the brief), for defendant-appellant.

Peter Fleming, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, John Sprizzo, Asst. U. S. Atty., on the brief), for appellee.

Before LUMBARD, Chief Judge, and MOORE and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This case raises perplexing issues of whether symbolic conduct is speech embraced by the First Amendment and the extent of its protection thereunder. The appeal challenges the constitutionality of a federal statute prohibiting the destruction of Selective Service certificates; the ultimate question before the court is the power of Congress to enact the legislation. The constitutional issues are raised by David J. Miller, who appeals from a judgment convicting him of knowingly destroying a Selective Service System Notice of Classification. Appellant was tried without a jury before Judge Tyler in the Southern District of New York. Taking into account Miller's sincerity and background, the judge suspended execution of a sentence of three years' imprisonment and placed appellant on two years' probation.[1] We hold the statute constitutional and affirm the conviction.

I. The Statute and the Facts

Appellant was convicted of violating section 12(b)(3) of the Universal Military Service and Training Act ("the

---

1. Special conditions of probation were that appellant obtain and carry a classification notice and obey orders of his draft board, probation to terminate if he entered military service.

Act"), as amended by 79 Stat. 586 (1965), 50 U.S.C.App. § 462(b)(3) (Supp. I, 1965). In August 1965, that section was amended to prohibit the knowing destruction or mutilation of a Selective Service certificate; the amended statute was the basis of appellant's conviction.[2] Judge Tyler found it undisputed that on October 15, 1965, at a street rally near the Army Building at 39 Whitehall Street in Manhattan, appellant burned his "draft card."[3] Appellant performed this act in the course of giving a speech; he believed the burning to be a symbolic protest against the draft, the military action in Vietnam, and "the draft card burning law itself." The court further found that other methods of speech used at the rally, although less dramatic than appellant's action, served as reasonably effective communication of the ideas involved.[4] Before considering appellant's arguments, it is instructive to examine the history of the statute under discussion.

Even prior to the August 1965 amendment, section 12(b) of the Act stringently regulated the physical certificates issued by the Selective Service System. It was thus illegal—with improper intent—to transfer a certificate to aid a person in making a false identification or representation, or to possess a certificate not duly issued to oneself for those purposes, or to forge, alter "or in any manner" change a certificate or any notation validly inscribed thereon, or to photograph or make an imitation of a certificate for false identification purposes, or to possess a counterfeited or altered certificate. In addition, under the authority delegated him by Congress (section 10(b)(1) of the Act), the President had promulgated a regulation requiring those who have been classified by a local board to have in their personal possession at all times

---

2. Section 12(b) of the Act provides:

 Any person (1) who knowingly transfers or delivers to another, for the purpose of aiding or abetting the making of any false identification or representation, any registration certificate, alien's certificate of nonresidence, or any other certificate issued pursuant to or prescribed by the provisions of this title, or rules or regulations promulgated hereunder; or (2) who, with intent that it be used for any purpose of false identification or representation, has in his possession any such certificate not duly issued to him; or (3) who forges, alters, *knowingly destroys, knowingly mutilates*, or in any manner changes any such certificate or any notation duly and validly inscribed thereon; or (4) who, with intent that it be used for any purpose of false identification or representation, photographs, prints, or in any manner makes or executes any engraving, photograph, print, or impression in the likeness of any such certificate, or any colorable imitation thereof; or (5) who has in his possession any certificate purporting to be a certificate issued pursuant to this title, or rules and regulations promulgated hereunder, which he knows to be falsely made, reproduced, forged, counterfeited, or altered; or (6) who knowingly violates or evades any of the provisions of this title or rules and regulations promulgated pursuant thereto relating to the issuance, transfer, or possession of such certificate, shall, upon conviction, be fined not to exceed $10,000 or be imprisoned for not more than five years, or both. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any certificate not duly issued to him, such possession shall be deemed sufficient evidence to establish an intent to use such certificate for purposes of false identification or representation, unless the defendant explains such possession to the satisfaction of the jury. [Emphasis added.]

 The italicized portion of the section was added in August 1965.

3. The certificate was actually a Notice of Classification (SSS Form No. 110). See Judge Tyler's opinion disposing of pre-trial motions 249 F.Supp. 59 (S.D.N.Y. 1965), and our discussion infra, pp. 74–75.

4. United States v. Miller, 65 Cr. 937, S.D.N.Y., March 7, 1966. For articles dealing with the case and the statute, see Forkosch, Draft Card Burning—Effectuation and Constitutionality of the 1965 Amendment, 32 Brooklyn L.Rev. 303 (1966); Rachlin, Draft Cards and Burning the Constitution, id. at 334; 34 Fordham L.Rev. 717 (1966); 11 N.Y.L.F. 584 (1965).

the Notice of Classification (SSS Form No. 110), except when entering upon active duty into the Armed Forces, when the certificate must be surrendered for destruction. 32 C.F.R. § 1623.5 (1962). Violation of this regulation was made a felony by section 12(b)(6) of the Act.[5]

The Notice of Classification itself is a white card, about the thickness of a postcard, and about two inches by three inches in size. The front of the Notice burned by appellant was in the following form:

SELECTIVE SERVICE SYSTEM
## NOTICE OF CLASSIFICATION

---

(First name) (Middle initial) (Last name)

Selective Service No.

| | | | |
|---|---|---|---|
| | | | |

is classified in Class _____

until _____

☐ by Local Board,

☐ by Appeal Board
 vote of _____ to _____

☐ by President

---

(Date of mailing)

---

(Member or clerk of local board)

---

(Registrant's signature)

SSS Form No. 110 (Revised 5-7-63)
(Approval not required)

The back provided:

[ ]

(Local Board Stamp)

You are required to have this notice, in addition to your Registration Certificate, on your person at all times and to surrender it upon entering active duty in the Armed Forces.

The law requires you to notify your local board in writing (1) of every change in your address, physical condition, and occupational, marital, family, dependency, and military status, and (2) of any other

---

5. The Registration Certificate (SSS Form No. 2, discussed infra) was also required to be in the registrant's personal posses-sion at all times. 32 C.F.R. § 1617.1 (1962).

fact which might change your classification within 10 days after it occurs.

Your Selective Service Number, shown on the reverse side, should appear on all communications with your local board. Sign this form immediately upon receipt.

FOR INFORMATION AND ADVICE, GO TO ANY LOCAL BOARD

The Registration Certificate referred to (SSS Form No. 2) is given to all Selective Service registrants when they register; important information contained on the Notice of Classification does not appear on the Registration Certificate, i. e., the registrant's classification, who classified him, and the vote, if by an Appeal Board. These facts do not develop until after a registrant has received Form No. 2. See 32 C.F.R. §§ 1617.1, 1622.1(c), 1623.1(a) (1962); Forkosch, supra note 4, at 303–04. See also 32 C.F.R. § 1627.3 (Supp.1966) (significance of vote).

To summarize, the Act and a regulation, even before the 1965 amendment was passed, required the Notice containing a registrant's classification to be in his possession at all times, and imposed stringent penalties for tampering with the certificate and in other ways subjecting it to abuse.

## II. Constitutional Arguments

Since appellant does not claim here that he did not violate the statute—nor is there any room for doubt on this score—and since no procedural infirmities are raised, we turn to the constitutional arguments advanced. Appellant contends that the 1965 amendment is unconstitutional (1) on its face, because its legislative history establishes that it was enacted deliberately to suppress dissent; (2) as applied to the facts of this case, because the conduct it punishes this defendant for is symbolic speech protected by the First Amendment; and (3) under the Fifth Amendment, because it serves no rational legislative purpose.[6]

As to the first contention, going behind the terms of a statute to divine the collective legislative motive for its enactment is rarely, if ever, done by a court. Thus, in Sonzinsky v. United States, 300 U.S. 506, 513–514, 57 S.Ct. 554, 556, 81 L.Ed. 772 (1937), the Supreme Court stated that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts." See Barenblatt v. United States, 360 U.S. 109, 132, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); United States v. Kahriger, 345 U.S. 22, 27, 73 S.Ct. 510, 97 L.Ed. 754 (1953) (allegation that improper motive was revealed in legislative history); Tenney v. Brandhove, 341 U.S. 367, 377, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Daniel v. Family Security Life Ins. Co., 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632 (1949). Ordinarily, if Congress has power to act in a field, judicial inquiry ends so long as the statute does not on its face infringe a constitutional right.[7] The 1965 amendment appears to meet this test. Congress clearly has power under Article I, section 8 of the Constitution to "raise and support Armies," and the Universal Military Training and Service Act and the 1965 amendment thereto

---

6. Constitutional questions were duly preserved for review by appropriate motions below; other arguments in the trial court, e.g., that a Notice of Classification is not a "certificate" under 50 U.S.C.App. § 462(b) (3), have apparently been abandoned.

7. We agree that when a First Amendment right is involved, the impact of the statute as applied must also be examined (see pp. 78–82, infra); but this is a wholly different argument leading to a different inquiry.

are, in their terms, proper exercises of that power. See Lichter v. United States, 334 U.S. 742, 756–758 n. 4, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918). On its face, the amended statute here attacked concerns administration of the draft, not regulation of ideas or the means of communicating them. This distinguishes such cases as Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), and Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), relied on by appellant.

 To prove the "real" congressional purpose of the 1965 amendment, appellant resorts to its legislative history, a source frequently used to construe the terms of a statute. But that history is inconclusive. Even though portions—particularly remarks by two Representatives (including the sponsor of the bill in the House)—indicate a desire to suppress political dissent, the more authoritative committee reports also show a concern that destruction of draft cards "represents a potential threat to the exercise of the power to raise and support armies."[8] It may even be conceded that the amendment was prompted by widely publicized burnings of draft cards occurring in demonstrations against this country's Vietnam policy.[9] But neither does that control disposition of the case. People v. Stover, 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272, appeal dismissed, 375 U.S. 42, 84 S.Ct. 147, 11 L.Ed.2d 107 (1963), involved a bizarre display of offensive objects on a clothesline in a residential area to protest high property taxes. Thereafter, the City of Rye enacted an ordinance which, in effect, prohibited clotheslines in a front or side yard abutting a street. On appeal from a conviction for violation of the ordinance, the New York Court of Appeals said (per Fuld, J., 12 N.Y.2d at 466, 240 N.Y.S.2d at 736, 191 N.E.2d at 274):

It is a fair inference that adoption of the ordinance before us was prompted by the conduct and action of the defendants but we deem it clear that, if the law would otherwise be held constitutional, it will not be stricken as discriminatory or invalid because of its motivation. (Cf. *Town of Hempstead v. Goldblatt*, 9 N Y 2d 101 [211 N.Y.S.2d 185, 172 N.E.2d 562], affd. 369 U.S. 590 [82 S.Ct. 987, 8 L.Ed.2d 130].)

The 1965 amendment clearly was intended to stop draft card burnings, but on its face the statute is narrowly drawn and does not discriminate between card-burning as protest or as something unrelated to symbolic communication. Another factor illustrates the difficulty here of adverting to motive, rather than looking primarily to the terms of the statute itself, in testing its constitutionality on its face. The duty to keep Selective Service certificates on one's person has been in existence for many years and has been held constitutional. United States v. Kime, 188 F.2d 677 (7th Cir.), cert. denied, 342 U.S. 823, 72 S.Ct. 41, 96 L.Ed. 622 (1951) (registrant claimed that religious belief motivated him not to carry certificate). Appellant does not claim that this requirement was aimed at suppressing dissent; had appellant destroyed the certificate in 1962 and been indicted for willful non-possession under the then applicable law, improper congressional motive would surely not have been successfully argued. But what Congress did in 1965 only strengthened what was already a valid obligation of existing law; i. e., prohibiting destruction of a certificate implements the duty of possessing it at all times. Therefore, to isolate and examine the motive of

---

8. Compare 111 Cong.Rec. 19135 (daily ed. Aug. 10, 1965) with S.Rep. No. 589, 89th Cong., 1st Sess. 2 (1965), and H.R.Rep. No. 747, 89th Cong., 1st Sess. 2 (1965) U.S.Code Congressional and Administrative News, p. 2889.

9. See Finman & Macaulay, Freedom to Dissent: The Vietnam Protests and the Words of Public Officials, 1966 Wis.L. Rev. 632, 644–53.

Congress in 1965 seems even less justifiable than it would ordinarily be.

We need not go so far as to say that an apparently innocuous statute can never be successfully attacked on the ground that the "real" congressional motive behind it was impermissible. We say only that the occasions cited to us where this has allegedly been done successfully are few, that they are in several ways distinguishable,[10] and that none involved a mere implementation of an already existing regulatory scheme. Under these circumstances, we decline to hold the 1965 amendment unconstitutional on its face.

Of course, this does not end the case. Appellant urges the First Amendment defense even more vigorously in his alternate argument that, as applied to the facts of this case, the statute is an unconstitutional suppression of speech. Appellant reasons as follows: Symbolic speech is protected by the First Amendment; burning a draft card in a public meeting is such symbolic speech; moreover, card-burning is a most dramatic form of communication, and there is a constitutional right to make one's speech as effective as possible, subject to the proper constitutional standard; and, finally, whether that standard be the clear and present danger test or a balancing of interests, the statute as it was applied to him is unconstitutional.

These syllogisms require examination of basic concepts. It may be assumed that by burning his draft card, David Miller intended to communicate his ideas in an especially effective way and succeeded in doing so. Appellant relies on Supreme Court decisions protecting an individual's right to express, or refrain from expressing, an idea symbolically.

Thus, West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), held that a compulsory flag salute was an unconstitutional violation of First Amendment rights of Jehovah's Witnesses. In that case, Mr. Justice Jackson said (319 U.S. at 632–633, 63 S.Ct. at 1183):

> There is no doubt that * * * the flag salute is a form of utterance. Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. * * * A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.

Twelve years before, in Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the Court struck down on First Amendment grounds a state statute that prohibited "the display of a red flag as a symbol of opposition by peaceful and legal means to organized government." See Barnette, supra, 319 U.S. at 633, 63 S.Ct. at 1183. See also Carlson v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104 (1940). Similarly, other unconventional symbolic acts have been recognized as means of communication, e. g., picketing—Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); civil rights sit-ins—see Garner v. State of Louisiana, 368 U.S. 157, 201–202, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); Brown v. State of Louisiana, 383 U.S. 131, 141–142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966).[11]

■ But that conduct may be symbolic does not end the matter; it is only the

---

10. E. g., in Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the Supreme Court relied on the unfair administration of a local ordinance in reversing a conviction of Chinese laundry operators. No such contention is made here; e. g., appellant does not claim that he was reclassified because he participated in a protest demonstration. See also

reference to Lamont v. Postmaster General and Grosjean v. American Press Co., supra, p. 76.

11. This characterization of a sit-in was accepted by Mr. Justice Harlan in *Garner* and by the "prevailing opinion" of Mr. Justice Fortas in *Brown* (joined in by Chief Justice Warren and Mr. Justice Douglas).

beginning of constitutional inquiry. Is all communicative action symbolic speech and is all symbolic speech protected by the First Amendment? The range of symbolic conduct intended to express disapproval is broad; it can extend from a thumbs-down gesture to political assassination. Would anyone seriously contend that the First Amendment protects the latter?[12] Appellant would undoubtedly respond that peaceful symbolic acts, as contrasted to violent ones, are protected and that draft card burning is clearly the former. The distinction is significant, of course; it was recognized in Milk Wagon Drivers, etc. v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), which denied free speech protection to picketing intertwined with acts of violence. But what of other more peaceable but unconventional symbolic acts? In People v. Stover, supra, the display of offensive objects on a clothesline was a protest against high property taxes; the court held that a zoning ordinance prohibiting such conduct was constitutional.[13] What of protests made dramatic by turning on water faucets,[14] dumping of garbage in front of City Hall,[15] stalling cars at an event attracting heavy traffic,[16] burning an American flag on a street corner,[17] or tearing up on television a court order or a document required to be kept under internal revenue regulations? Each such act may be designed to mobilize public opinion against an existing statute or government policy; yet, sincere motivation or the labeling of even non-violent

conduct as symbolic does not necessarily transform that conduct into speech protected by the First Amendment. It may be that particular considerations surrounding a specific symbolic act justify clothing it in the concept of speech. Thus, picketing, like sit-ins, may be the poor man's printing press;[18] similarly, the technique of a "silent and reproachful presence"[19] may be the only means of true communication in certain areas of the civil rights struggle. We mention all these acts not to decide whether they are properly characterized as speech but only to emphasize the complexity of the problem. We are not at all sure that destroying a draft card even at a public rally must be regarded as an exercise of speech, but we are willing to assume it *arguendo*, as the district court did. However, this only forms the basis for further analysis. Appellant concedes that even speech may be regulated, or in certain circumstances prohibited, provided that the proper constitutional test is met; it is here that appellant contends the 1965 amendment fails.

Appellant argues that since speech is involved, the statute prohibiting it must be evaluated under the clear and present danger test, which, in its classic statement, is:

whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a

---

12. "Political assassination is a gesture of protest, too, but no one is disposed to work up any First Amendment enthusiasm for it." Kalven, The Negro and the First Amendment 133 (1965).

13. It is perhaps significant that an appeal to the Supreme Court was dismissed for want of a substantial federal question, 375 U.S. 42, 84 S.Ct. 147, 11 L.Ed.2d 107 (1963). The case is discussed in Comment, 64 Colum.L.Rev. 81 (1964).

14. Kalven, The Concept of the Public Forum: Cox v. State of Louisiana, in 1965 The Supreme Court Review 1, 11.

15. N.Y.Times, April 22, 1964, p. 1, col. 6.

16. Id., August 22, 1963, p. 18, col. 2.

17. People v. Street (N.Y.C.Crim.Ct., Kings Co., July 26, 1966, appeal pending, App. T., 2d Dep't) in N.Y.Times, July 27, 1966, p. 47, col. 6.

18. Kalven, op. cit. supra note 12, at 133.

19. Brown v. State of Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (opinion of Fortas, J.).

right to prevent. It is a question of proximity and degree.

Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). See also Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). However, recent Supreme Court decisions have applied a balancing approach to determine the constitutionality of legislation that indirectly restricted speech. In American Communications Assn., CIO v. Douds, 339 U.S. 382, 70 S. Ct. 674, 94 L.Ed. 925 (1950), certain unions challenged a statute that required union officials to file a non-Communist affidavit as a condition of using the services of the National Labor Relations Board. Rejecting the argument that the statute violated the First Amendment, the Court said (339 U.S. at 399, 70 S.Ct. at 684):

> When particular conduct is regulated in the interest of public order, and the regulation results in an indirect, conditional, partial abridgment of speech, the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented.

More recent cases indicate the continued vitality of this balancing test. See Konigsberg v. State Bar, 366 U.S. 36, 49–51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Communist Party of U. S. v. Subversive Activities Control Bd., 367 U.S. 1, 91, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). See also Barenblatt v. United States, 360 U.S. 109, 126–127, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); NAACP v. State of Alabama, 357 U.S. 449, 461, 78 S.Ct. 1163, 2 L.Ed.2d 1488

(1958); United States v. Aarons, 310 F.2d 341, 345 (2d Cir.1962). The district court apparently employed this standard. We agree that the most recent Supreme Court decisions seem to require its use, at least where a narrowly-drawn statute on its face regulates conduct, not the communication of ideas.[20]

■ Under this approach, the public interest to be protected is the proper functioning of the Selective Service System. In a world where resort to force is still the rule, rather than the exception, this is an interest of the highest order; its importance undoubtedly accounts for the many decisions rejecting First Amendment defenses to Selective Service violations. See United States v. Kime, supra; United States v. Mohammed, 288 F.2d 236, 244 (7th Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 37, 7 L.Ed.2d 26 (1961); United States v. Miller, 233 F.2d 171 (2d Cir.1956) (per curiam); Gara v. United States, 178 F.2d 38 (6th Cir. 1949), aff'd by an equally divided court, 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950). Indeed, we do not understand appellant to question the need for proper operation of the draft; instead he questions whether the 1965 amendment actually serves this important end. The trial court held that it did, but appellant argues that the court gave no reasons to support its conclusion and that there are none in fact.

We conclude that forbidding destruction of Selective Service certificates serves legitimate purposes in administering the system. To begin with, the Notice of Classification serves as proof of registration and it also contains complete

---

20. While United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), reaches on a bill of attainder theory a result inconsistent with American Communications Assn., CIO v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), we do not regard it as a rejection of use of the balancing test in the situation before us. For a criticism of the test if used generally, see Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 912–14 (1963); see also Frantz,

The First Amendment in the Balance, 71 Yale L.J. 1424 (1962); Meiklejohn, The First Amendment Is an Absolute, in 1961 The Supreme Court Review 245; Black, The Bill of Rights, 35 N.Y.U.L.Rev. 865 (1960). For more sympathetic treatment of a balancing test, see Karst, Legislative Facts in Constitutional Litigation, in 1960 The Supreme Court Review 75; Mendelson, Justices Black and Frankfurter: Conflict in the Court (1961).

information as to a registrant's classification, including the type and date thereof, and the period for which it is effective. Thus, inability to produce the card provides an easy means of initially detecting those attempting to evade their Selective Service obligations.[21] Similarly, in time of war or national emergency, it provides an instant means in a transient society of determining a registrant's fitness for immediate induction, if exigencies require it. Thus, appellant lives in New York City but is registered in Syracuse. In an extreme emergency (e. g., a call-up by radio), he could be ordered to report to a local board in New York City, although that board has no record relating to appellant; only if he possessed his own Notice of Classification could his fitness for induction be determined accurately and expeditiously. Moreover, the Notice of Classification can assist a local board to reconstruct files destroyed by fire or other disaster.[22] In addition, the Notice carries a continual reminder to a registrant of his obligation to notify his local board of facts which might change his classification. The Notice also guarantees a registrant's prompt receipt of accurate information of his current status and enables him to prove it should the occasion arise. Moreover, it facilitates his personal inquiries to a local board: To provide correct information as to a registrant's present draft status, the board must know his current classification. If a registrant inquires of his own local board, the Notice furnishes this knowledge quickly without a search of records; if the registrant inquires of another local board in a community where he happens to be, it may be the only way he can obtain the information. To conclude, proper functioning of the system depends upon the aggregated consequences of individual acts; in raising an army no less than in regulating commerce, cf. Wickard v. Filburn, 317 U.S. 111, 127–128, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the seriousness of an individual's acts must often be assessed not only in isolation but under the assumption that they may be multiplied manifold. Therefore, the interest to be served—efficient functioning of the Selective Service System—is furthered by the statute under attack.

Against these reasons must be weighed the effect of the statute on freedom of expression. Except to prohibit destruction of certificates, the statute does not prevent political dissent or criticism in any way. It is narrowly drawn to regulate a limited form of action. Under the statute, aside from destroying certificates, appellant and others can protest against the draft, the military action in Vietnam and the statute itself in any terms they wish—and indeed did so at the rally where appellant was arrested. Appellant claims, however, that the burning of a draft card is more dramatic than mere speech and that he has a right to the most effective means of communication. But surely this generalization has its own limits. In Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), a conviction was affirmed under an ordinance forbidding the use on public streets of sound trucks or any other instrument which emitted a "loud and raucous" noise. To the claim that the statute unconstitutionally abridged freedom of speech, the "prevailing opinion" of the Court stated (336 U.S. at 88–89, 69 S.Ct. at 454):

> That more people may be more easily and cheaply reached by sound trucks * * * is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance *when easy means of publicity are open.* Section 4 of the ordinance bars sound trucks from broadcasting in a loud and raucous manner on the streets. *There is no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers.* [Emphasis added.]

21. Forkosch, supra note 4, at 324–25.

22. Ibid.

We do not imply that the existence of many means of communication may ordinarily justify a ban on one of them; for example, suppression of a newspaper because radio and television are available is clearly unconstitutional. See NLRB v. Fruit & Vegetable Packers, 377 U.S. 58, 79–80, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (Black, J., concurring). We only say that in the case of the symbolic speech posed here, such a consideration is proper. See Kovacs v. Cooper, supra 336 U.S. at 97, 69 S.Ct. at 459 (Jackson, J., concurring) ("The moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each, in my view, is a law unto itself, and all we are dealing with now is the sound truck."). Moreover, pure speech and conduct offered symbolically as speech need not be regarded as identical. In Cox v. State of Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965), the Court said:

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. * * * We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., *supra* [336 U.S. 490] at 502 [69 S.Ct. 684, at 691, 93 L.Ed. 834], that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

See also City of Greenwood, Miss. v. Peacock, 384 U.S. 808, 826–827, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966). Viewing all of the considerations, we find that under the test applied in American Communications Assn., CIO v. Douds, supra, and in later cases,[23] the "particular conduct [destruction of draft cards] is regulated in the interest of public order," that "the regulation results in an indirect" and minimal abridgment of "speech" and that the former "demands the greater protection under the particular circumstances presented." Accord, United States v. Smith, 249 F.Supp. 515 (S.D. Iowa 1966), appeal pending, 8th Cir. We are supported in this conclusion by the knowledge that appellant and those who agree with him remain free, as indeed they should be, to criticize national policy as vigorously as they desire by the written or spoken word; they are simply not free to destroy Selective Service certificates.

■ Appellant's final argument is that since the statute does not serve any rational legislative purpose the statute is an unconstitutional deprivation of individual liberty without due process of law under the Fifth Amendment. Thus, appellant points out that the 1965 amendment has been called "a silly law" in a national periodical with extensive circulation.[24] However, it is not the province of the judiciary to praise or condemn this law; our function is to determine only the power of Congress in enacting the statute, not its wisdom. For the reasons already given at length above, we find that the statute is neither arbitrary nor without purpose, that it is reasonably related to the power of Congress to raise and support armies, and that it reinforces an obligation which has been imposed upon registrants for many years. Accordingly, the judgment of conviction is affirmed.

23. See cases cited supra, p. 80.

24. See Wainwright, "A Serious To-Do About a Silly Law," Life, March 4, 1966, p. 17.