Pat WRIGHT and Jack Lieberman,
Plaintiffs-Appellants,

v.

CHIEF OF TRANSIT POLICE, and Chairman and Members of the Board of the New York City Transit Authority, Defendants-Appellees.

No. 446, Docket 76–7405.

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 1977.

Decided June 8, 1977.

Meskill, Circuit Judge, dissented and filed opinion.

Herbert Jordan, New York City (K. Randlett Walster, Rabinowitz, Boudin & Standard, New York City, of counsel), for plaintiffs-appellants.

James P. McMahon, Brooklyn, N.Y. (Alphonse E. D'Ambrose, Helen R. Cassidy, Terrance J. Nolan, Brooklyn, N.Y., of counsel), for defendants-appellees.

Stuart Riedel, Gen. Counsel, New York City Transit Authority, Brooklyn, N.Y., for defendant-appellee New York City Transit Authority.

Before FEINBERG, GURFEIN and MESKILL, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiffs, members of the Socialist Workers Party, attempted to sell socialist newspapers in the New York City subway system by displaying their newspapers by hand and trying to engage interested persons in conversation regarding the content of the papers. Transit Authority policemen threatened to ticket them, and the Transit Authority subsequently told plaintiffs that their activity violated Authority regulations. In February 1975, plaintiffs brought suit in the United States District Court for the Eastern District of New York. Invoking 42 U.S.C. § 1983 and the first amendment, plaintiffs sought a preliminary injunction and other equitable relief against the ban on their sales activity. The district court, Walter B. Bruchhausen, J., denied a

preliminary injunction and dismissed the complaint for lack of jurisdiction on the ground that defendants were not "persons" within the meaning of § 1983. This court reversed the latter ruling, but affirmed the denial of plaintiffs' motion for a preliminary injunction. *Wright v. Chief of Transit Police*, 527 F.2d 1262 (2d Cir. 1976). We remanded to the district court "for expeditious trial." Id. at 1264.

The trial was held before Judge Bruchhausen, without a jury, on May 13, 1976. Plaintiffs testified as to the benefits of using the subway system for their sales, and defendants' witnesses testified concerning the safety hazards posed by plaintiffs' type of activity on the narrow and often crowded subway platforms. Defendants also introduced evidence on the revenues the Transit Authority receives from granting newsstand concessions in the subway system and on the availability of those newsstands for the sale of plaintiffs' papers. The district court then dismissed plaintiffs' complaint, finding, among other things, that "plaintiffs' conduct would interfere with the safety and convenience of the public." Plaintiffs now appeal from that dismissal. Because we find that the purpose of our prior remand has not been fulfilled, we reverse the district court's order and remand for further proceedings.

In our prior opinion, 527 F.2d at 1264, we recognized that

[d]efendants express justifiable concern about passenger safety and convenience, space limitation and the possible inundation of their limited facilities by others who would seek the same rights as plaintiffs.

We nonetheless remanded the case to the district court for determination whether those concerns could be accommodated by reasonable regulations short of a complete ban on plaintiffs' activities or whether a complete ban was justified in light of a compelling state interest. Id. The case has now returned to us, but we still lack any findings on whether defendants' concerns and plaintiffs' objectives can be harmonized through a reasonable set of regulations. The district court opinion rests instead on the general assertion that "plaintiffs' conduct would interfere with the safety and convenience of the public." There is no indication from the opinion that the court explored alternative possibilities short of a total ban, such as permitting plaintiffs' activity in off-peak hours and in areas of the larger stations like Grand Central, Union Square and Times Square, not adjacent to the tracks.[1]

Plaintiffs, of course, have no absolute right to proselytize and solicit in the New York subway system, and they long ago conceded that their actions must be subject to reasonable regulations. Plaintiffs' combination of proselytizing and selling is, however, protected activity under the first amendment, cf. *Wolin v. Port of New York Authority*, 392 F.2d 83, 92–93 (2d Cir. 1968), and in similar situations, we have recognized the need for accommodation. See *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319 (2d Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974); *Wolin v. Port of New York Authori-*

---

1. The dissenting opinion argues that appellants failed to introduce any evidence concerning a reasonable restriction. We believe that appellants did produce evidence of places in the subway system where their activities might safely be carried on. But in any event, the dissent mistakenly places the burden of proof upon appellants on the issue whether reasonable restrictions are impossible. On the contrary, once appellants have shown a protected interest in speech under the first amendment it is incumbent upon the governmental authority to prove that there is a compelling state interest in its total ban. *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). This puts the burden on the governmental authority to establish that nothing less than a total ban would serve this compelling state interest. *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); cf. *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Shelton v. Tucker*, 364 U.S. 479, 488–90, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Whether or not a particular forum is a "public forum" akin to a public street is merely a variant of the "compelling interest" test.

*ty, supra.* We recognize that the problems and characteristics of the subway system are certainly different from those of the Bus Terminal building of the Port Authority in *Wolin, supra,* and the Albany Welfare Center in *Wyman, supra,* but we cannot assume that promulgation and enforcement of reasonable regulations is impractical without appropriate findings from the district court. There were no such findings after our reversal. Instead, the district court relied on the availability of newsstands for the sale of plaintiffs' papers as a ground for dismissing the complaint. This possibility, however, was apparent to the prior panel, since it was briefed by both parties on that appeal, and does not dispose of plaintiffs' claim of a right, limited by reasonable regulations, to use speech and press conjunctively in the presentation of their ideas. Similarly, the district court's reliance on the state's interest in the revenues it receives from its newsstand concessions is misplaced. Again, there was no consideration of the effect reasonable regulations short of a complete ban would have on this interest, nor of the possibility that the Authority might be allowed to charge fees, related to its administrative expense, for the privilege of selling newspapers in the manner plaintiffs propose. See *United States Labor Party v. Codd,* 527 F.2d 118 (2d Cir. 1975).

In short, this case remains in much the same posture it presented a year and one-half ago: plaintiffs' valid claims of first amendment protection face the state's valid concerns for public safety. As before, we are sympathetic to the state's concerns, but the possibility of reasonable regulations short of a complete ban remains, and the district court still has not made any findings on the issue.

We reverse the order of the district court and remand for further findings in accordance with this opinion.[2]

MESKILL, Circuit Judge, dissenting:

I respectfully dissent. The initial burden of establishing the unconstitutionality of a regulation is on the party challenging it. Had the plaintiffs established that the subways are a "public forum" appropriate for First Amendment activity, the Transit Authority would have the burden, imposed by the majority, of showing the need for a total ban on expressive activity. However, there are two threshold matters of proof which the plaintiffs must meet before the stringent test the majority applies becomes appropriate. First, plaintiffs must show that their sales are an activity entitled to special First Amendment protection. Second, they bear the burden of showing that the subways are, in fact, a "public forum" which could safely accommodate expressive activity. Assuming for the sake of argument that plaintiffs have cleared the first hurdle, they certainly have not even approached the second one. In fact, they failed to introduce any evidence at all on the point.[1]

---

2. On remand, both parties should be allowed to submit further evidence on the possibility of promulgating reasonable regulations governing plaintiffs' activities.

1. This two-step analysis was utilized by this Court in *United States v. Miller,* 367 F.2d 72 (2d Cir. 1966), *cert. denied,* 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787 (1967). That case involved a defendant who had burned his draft card as a gesture of protest against the war in Vietnam. This violated 50 U.S.C. § 462(b)(3). The Court first examined the claim that the conduct was expressive. *Id.* at 78–79. After assuming *arguendo* that it was, the Court applied a balancing test, since it was dealing, as here, with "a narrowly drawn statute on its face [which] regulates conduct, not the communication of ideas." *Id.* at 80. It concluded that the interests of the government in the efficient operation of the draft outweighed the burden on free expression.

The case at bar is even more appropriate for this two-step analysis than *Miller.* The regulation at stake here applies only to commercial activity in a limited area. In *Miller,* the prohibition was universal and applied to non-commercial activity. Moreover, there was some evidence in *Miller* that the law was aimed at expressive conduct. In this case, no one has suggested that the Transit Authority is actually interested in suppressing dissent.

At p. 68 n. 1, the majority states that the burden is on the government to demonstrate that a particular site is wholly inappropriate for expressive conduct. This theory is not only unworkable, but unsupported by the cases cited by the majority.

Nevertheless, the majority remands for the second time in what threatens to become an endless lawsuit. On this remand, the Transit Authority is to attempt to prove that there is no alternative to a total ban on newspaper sales in the subways. Although it is always difficult to prove a negative, I believe this defendant has already done so. Because I can see no reason to relieve the plaintiffs from their burden to prove their case, I cannot agree with the majority's disposition here.

At the outset, it is helpful to briefly sketch the origins of this controversy in somewhat more detail than does the majority. After two incidents in which Transit Authority policemen threatened to "ticket" plaintiffs, their attorney wrote to the Transit Authority. He stated that he had advised his clients that the First Amendment protected their right to sell newspapers in such large subway stations as Times Square and Union Square, and asked the Transit Authority to similarly inform its patrolmen. The letter stated that the plaintiffs would abide by "any reasonable regulations as to the precise time and place of selling within the stations, if any such regulations exist." The Transit Authority responded as follows:

> The sale of "The Militant" in the manner you propose is prohibited by Transit Authority regulations. (21 NYCRR Part 1051.) Due to the confined space in the subways, a free flow of passenger traffic must be maintained in order to secure the safety of our riders. Your proposed method of sale would interfere substantially with this traffic flow, and thereby create hazardous conditions for subway riders.

Shortly after this, without any further attempt to negotiate with the Transit Authority, the plaintiffs brought this lawsuit in the Eastern District of New York.

As the majority notes, the late Judge Bruchhausen erroneously dismissed the action for lack of subject matter jurisdiction. He further refused to grant a preliminary injunction on the ground that plaintiffs had failed to demonstrate irreparable injury, a finding in which the plaintiffs concurred. We reversed, however, on the jurisdictional point, and remanded for trial.

At the trial, the two plaintiffs testified in their own behalf. They both stated that they had sold newspapers in the subway in the past, and wished to do so again. They testified that the subway presented three major advantages to them. These were that the stations were sheltered from the elements; that they contained people waiting for trains, who were easier to approach than those hurrying by; and that the subway was crowded with "working people" thought especially receptive to plaintiffs' message.

The Transit Authority called several witnesses involved in the administration of the subways. They all testified to the narrowness of the platforms, the possibility that a station could become unusually crowded in a short period of time and the dangers posed by the activity proposed by plaintiffs. There also was testimony about other groups requesting rights to solicit in the subways. The Transit Authority introduced a letter from the corporation holding the newsstand concession in the subway, offering to sell *The Militant* and *The Young Socialist* at its stands.

*Lovell v. Griffin* struck down a regulation which gave complete discretion to a local official to license First Amendment activity. *Cantwell v. Connecticut* turned on the same doctrine. *Cox v. Louisiana* involved a political demonstration in the streets. The Supreme Court also held there that the statute was vague, that uncontrolled discretion was vested in local officials, and that there was no evidence of a breach of the peace. *Schneider v. State* involved a total prohibition on the public distribution of literature, unless a local official waived the ban. *Shelton v. Tucker* struck down, as overbroad, a state statute requiring teachers to disclose all their organizational affiliations. Finally, *United States v. O'Brien* upheld a statute banning destruction of draft cards. None of these cases supports the majority's position that the government must show a "compelling interest" to exclude or regulate expressive conduct in locations like the subway. The phrase "First Amendment" is not a magical invocation opening any public facility to political activity.

The testimony made it clear that seemingly trivial obstructions could cause substantial inconvenience and danger. The appellants conceded, both at trial and on appeal, that most of the subway system, including all of its platforms and trains, was entirely inappropriate for First Amendment activities. They now claim that there are areas, such as the mezzanines and concourses of some large stations, where these safety considerations do not prevail.[2] There was evidence at trial, however, which appellants do not seriously dispute, that even these areas can become crowded, and that numerous accidents have occurred there. Because of this danger, they state that they are willing to abide by "reasonable regulations." *Compare Chicago Area Military Project v. Chicago*, 508 F.2d 921 (7th Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975) (striking down general prohibition on leafletting in airport, but upholding ban in corridors leading to airplanes).

When this case was first here, the opinion concluded:

Analysis of the merits of this case would be premature in its present posture. Defendants express justifiable concern about passenger safety and convenience, space limitation and the possible inundation of their limited facilities by others who would seek the same rights as plaintiffs. However, it is possible that this concern can be accommodated by less than a complete proscription of plaintiffs' activities. While the time, manner and place of solicitation may be regulated, before it can be totally banned, a compelling state interest must be shown. *Albany Welfare Rights Organization v. Wyman*, 493 F.2d 1319, 1323 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). Whether such a state

interest exists herein must await development of the proof.
527 F.2d at 1264.

Judge Bruchhausen's findings complied with this dictum. On the basis of the testimony, he found that "[t]here is no doubt that the plaintiffs' conduct would interfere with the safety and convenience of the public." He also concluded that this was a "compelling state interest." The plaintiffs' proposed sale was characterized as "hazardous to the general public," and one that "jeopardize[d] the safety and free flow of traffic of the public." Finally, he concluded that "[t]o hold otherwise would cause complete havoc with the passengers and obstruct their movement to and from the trains." These are clearly findings of fact. The Transit Authority has met its burden of demonstrating the need for a total ban on plaintiffs' sales.

The majority does not reject these findings as clearly erroneous. Rather, it concludes that "we still lack any findings." This conclusion is buttressed by reference to the possibility of using parts of large stations during off-peak hours as a less restrictive alternative to a total ban. There is no evidence in the record to support these possibilities. Nor is there any suggestion in the record that plaintiffs were stopped from engaging in these arguably protected activities, or that they are interested in selling newspapers in remote corners of the subway at odd hours.[3]

The plaintiffs were given an opportunity at trial to introduce evidence of such alternatives. Had they done so, Judge Bruchhausen's findings would still not be clearly erroneous. In that case, the majority's conclusion would merely be appellate fact-finding. Here, however, the plaintiffs failed to adduce any such proof. I can only conclude

---

**2.** The plaintiffs failed to introduce any evidence of this at trial, except for their own self-serving statements that they believed they could sell their papers safely in these stations. Thus, this argument should not be considered. Judge Bruchhausen's findings are an implicit rejection of this theory.

**3.** The record shows that at least one, and possibly both of the "ticketing" incidents took place in areas adjacent to the tracks. Moreover, the very factors that plaintiffs cite as making the subway desirable undercut this claim. They wish to solicit the large number of people waiting for trains. This hardly makes sense if the chosen spot is a remote corner of a large station.

that the majority's decision is based upon their own experience in the subways, for it finds no support in the record, nor does it claim to do so. Such personal observations are far beyond the permissible scope of judicial notice.

Even assuming the extra-record facts which form the basis for the remand, the judgment of the district court should be upheld. The main hurdle for plaintiffs here is to establish that the subway is a "public forum," suitable for First Amendment activity; it is clear that it is not.

The classic definition of the public forum was given by Mr. Justice Roberts in *Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

Appellants' case thus depends upon establishing that the subway, at least in part, is the constitutional equivalent of a street or a park, and similarly appropriate for First Amendment activity.

The mere fact of public ownership does not convert a facility into an appropriate place for the exercise of First Amendment rights. *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military reservation); *see* Kalven, The Concept of the Public Forum: *Cox v. Louisiana*, 1965 Sup.Ct.Rev. 1. Thus, the grounds of a state capitol, but not the driveway of a county jail, is an appropriate site for a protest against racial discrimination. *Compare Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state capitol), *with Adderly v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (prison). It is necessary to examine the characteristics of the forum in order to decide whether it is enough like streets and parks to call for treatment as a public forum. *Wolin v. Port of New York Authority*, 392 F.2d 83, 89 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

The function of the subway system is not to provide a place for the expression of political views, but to transport millions of people every day. As the Supreme Court has stated, in another case involving the use of a transit system as a public forum:

> Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters . . . . The [advertising space], although incidental to the provision of public transportation, is a part of the commercial venture.

*Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974).

If expressive activity is to be allowed at all in the subways, it must be in such a way that it does not substantially interfere with the actual purpose of the subway. *See* Stone, Fora Americana: Speech in Public Places, 1974 Sup.Ct.Rev. 233, 251–52. That the New York City subways are crowded and potentially dangerous is a fact known to anyone who lives or works in New York. The testimony at trial only served to underscore this. The combination of danger and interference with normal use may be significant enough in some cases to support a total ban on expressive activity. T. Emerson, The System of Freedom of Expression, 359–64 (1970). One can think of many examples of this. Thus, the lobby of a publicly owned theatre on the night of a performance is not an appropriate place for the hand-to-hand sale of newspapers, despite

the fact that a "reasonable rule or regulation" might "accommodate" the competing interests. The state is under no obligation to go to extremes to convert every conceivable site into a First Amendment forum. When we have required the opening of an area for political expression, it has generally been because of the facility's resemblance to the "streets and parks" of *Hague, see Wolin v. Port of New York Authority*, 392 F.2d 83, 89–90 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (Port Authority bus terminal). In other cases, limited expressive activity logically connected to the forum has been allowed. *Albany Welfare Rights Org. v. Wyman*, 493 F.2d 1319, 1323–24 (2d Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (pamphlets concerning welfare in welfare office). *See Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (opinion of Fortas, J.) (civil rights protest in segregated facility).

This is not such a case. The appellants' contention is that at unpredictable intervals, small portions of the subway system are appropriate for the sale of their newspapers. On this basis, they seek to invalidate the anti-peddling rule as overbroad. Their claim is that the rule sweeps within its ambit protected as well as unprotected activity. Appellants thus challenge the rule "on its face," without any showing that they themselves engaged in the arguably protected conduct.

The overbreadth doctrine has had a recent history of fits and starts. *Compare Note*, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970), *with* Torke, The Future of First Amendment Overbreadth, 27 Vand.L.Rev. 289 (1974). The doctrine is an exception to the ordinary requirements of standing, with a corresponding loss in the concreteness with which a case is presented. Because it summarily invalidates an entire law, *Coates v. Cincinnati*, 402 U.S. 611, 617, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (opinion of Black, J.); *see Younger v. Harris*, 401 U.S. 37, 52–53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), it is to be sparingly applied. The case before us does not call for this strong constitutional medicine.

The Supreme Court has recently reduced the scope of overbreadth challenges in cases, such as the instant one, in which the "burden" on free speech is a by-product of an otherwise valid regulation of conduct. In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Court stated:

> [T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. *Cf. Alderman v. United States*, 394 U.S. 165, 174–75 [, 89 S.Ct. 961, 966–967, 22 L.Ed.2d 176] (1969). To put the matter another way, *particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.*

*Id.* at 615–16, 93 S.Ct. at 2918 (emphasis supplied).

This case falls squarely within the "substantial overbreadth" test of *Broadrick*. The Transit Authority's rule is not aimed at expression, but at peddling in the subways—an activity which the appellants concede can be constitutionally banned. Any First Amendment impact of this rule is a by-product of a valid regulation of commer-

cial activity.[4] Moreover, the ban is entirely neutral; it allows for no discrimination among the items offered for sale.

The portions of the subway system in which peddling newspapers arguably should be considered protected activity constitute a small fraction of the total system. The extra police that would be required to insure that those infused with proselytizing zeal will not stray from these limited areas would impose substantial costs upon a system already struggling under a crushing financial burden.[5] Furthermore, if *The Militant* and *The Young Socialist* are distributed in the manner proposed, other groups with a message will undoubtedly find the subway just as attractive. The Transit Authority would then be faced with the difficult administrative task of apportioning space among different groups, while avoiding any appearance of favoritism.[6] *See Greer v. Spock, supra; Lehman v. City of Shaker Heights, supra,* 418 U.S. at 304, 94 S.Ct. 2714. Finally, the Transit Authority would be forced to differentiate those selling papers for a cause from those who sell newspapers simply as a commercial activity. The failure to do so also might jeopardize the substantial revenues now derived from newsstands by indiscriminately opening the system to peddlers. Trying to make this distinction would require subtle constitutional judgments which the Transit Authority is ill-equipped to make. In short, allowing these sales would impose a far greater burden than the minor benefits it might confer. Moreover, the ban vindicates important interests of the state. *See Cox v. Louisiana,* 379 U.S. 559, 560–64, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). Thus, it is clear that the anti-peddling rule is not "substantially overbroad."

Appellants' argument that their particular method of sale is constitutionally protected also fails. Their newspapers are subject to no discrimination because of their content. At trial, the Transit Authority introduced a letter from the owner of all subway newsstands, stating that its policy is to sell newspapers of all political persuasions. Apparently, these papers are actually sold at a number of subway stations. Moreover, there is nothing in the record which suggests that appellants cannot approach strangers in the subway and attempt to convert them to socialism. All that is regulated is appellants' proposed method of selling their papers.

One who mounts a First Amendment challenge on the ground of overbreadth cannot simply bring his lawsuit and then wait while the state proves that all other possible regulations would prove inadequate. The plaintiffs have an obligation to at least suggest one less restrictive alternative to the trial court. The plaintiffs have failed to meet even this modest requirement; in fact, at oral argument, their counsel steadfastly maintained that he was under no obligation to inform the Court of the general outlines of the rule he had in mind. The majority now supports this view, remanding for a third district court proceeding at which the court will "explore" the possibility of some other rule. The job of rulemaking is not for the federal courts, but for the Transit Authority. The plaintiffs did not seek negotiations with the Authority, and to date have not advanced any compromise to the courts. I fail to see why we should guess at a set of rules which would please them.

One who wishes to communicate in public is not necessarily entitled to use what he

---

4. Many laws with no First Amendment overtones incidentally burden expression. Thus, a bookstore owner is protected by the First Amendment. However, the Constitution gives him no right to locate in an area zoned only for residential use. Similarly, the Supreme Court has recently approved special zoning directed at expressive, "adult entertainment" businesses. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

5. If appellants can pay, the administrative cost imposed by their peculiar mode of newspaper distribution could be imposed upon them. *See United States Labor Party v. Codd,* 527 F.2d 118 (2d Cir. 1975).

6. Indeed, the need for broad administrative discretion in this sensitive area is a further argument against it.

feels is his most effective means of communication. *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (ban on sound trucks); *Vietnam Veterans Against the War v. Morton*, 164 U.S.App.D.C. 391, 506 F.2d 53, 58 (1974) (encampment in public park); *United States v. Miller, supra*, 367 F.2d at 81 (burning of draft card). When, as here, we deal with regulation of commercial conduct, factors such as convenience and safety must be balanced against the claim of free expression. Judge Bruchhausen found that the safety concerns of the Transit Authority were compelling, and indeed that it had an "obligation" to enact a ban in the public interest. Since this finding is not clearly erroneous, it should not be disturbed on appeal.[7]

I would affirm the judgment of the district court dismissing the complaint.

---

**7.** The subway ridership is a captive audience. Those waiting for a train will become fair game for numerous hawkers of political, economic and religious literature, should this regulation be struck down. It is certainly a reasonable exercise of discretion for the Transit Authority to ban this sort of exploitation of its fare-paying ridership. *See Lehman v. City of Shaker Heights, supra*; Black, He Cannot Choose But Hear: The Plight of the Captive Auditor, 53 Colum.L.Rev. 960 (1953). It is precisely this feature that makes the subway so attractive to the appellants. However, it also serves to provide an additional justification for the Transit Authority's rule.