The WASHINGTON POST
COMPANY, Plaintiff,

v.

Carmen E. TURNER, Defendant.

Civ. A. No. 89-0304-OG.

United States District Court,
District of Columbia.

March 15, 1989.

Daniel K. Mayers, Patrick J. Carome, Wilmer, Cutler & Pickering, Washington, D.C., for plaintiff.

Gerard J. Stief, Associate General Counsel, Washington Metropolitan Area Transit Authority, Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on the motion of plaintiff The Washington Post Company ("the Post") for a preliminary injunction. The Post seeks injunctive relief that would prohibit defendant, the General Manager of the Washington Metropolitan Area Transit Authority ("WMATA") from enforcing a regulation which bans the sale of newspapers by human vendors on WMATA property and that would require defendant to permit human vending of newspapers on terms at least as permissive as

those applicable to "free speech activities" under the regulations.

BACKGROUND

I. The Parties

The Post publishes *The Washington Post* (*"The Post"*) newspaper, which is distributed and sold to the general public throughout the greater Washington, D.C. metropolitan area. Total average, paid circulation of *The Post* is approximately 770,000 for weekday editions, 724,000 for Saturday editions, and 1.1 million for Sunday editions. The vast majority of *The Post's* circulation is by direct delivery to subscribers. Approximately 19–25% of the paper's circulation is through single copy distribution; some of these sales are accomplished through individual vendors or "hawkers" who station themselves in public places and make sales to passersby.

WMATA was created by an Interstate Compact entered into by Maryland, Virginia, and the District of Columbia and approved by Congress. WMATA operates the mass transit system for the District of Columbia and the suburbs in Maryland and Virginia. WMATA has operated the Metrorail System since March 29, 1976. The Metrorail System currently extends approximately 70 miles and includes 64 stations. WMATA transports an average of approximately one-half million persons per day.

II. Sale of Newspapers Prior to Use Regulation

Defendant asserts and plaintiff does not dispute that when Metrorail began operations in 1976, publishers of *The Post* and *The Washington Star* sought to circulate their newspapers through the use of hawkers and vending machines on WMATA property. WMATA took action through its Transit Police to stop the sales because these papers had not received permission from WMATA to sell newspapers. During the ensuing years, a series of meetings was held between representatives of *The Post*, *The Washington Star*, other members of the Washington Publishers Association and WMATA. *See* Affidavit of John E. Warrington (Auditor General of WMATA; formerly Director of WMATA's Office of Marketing), at ¶¶ 3–5.

At some point in March, 1977, negotiations became stalled over the issue of approval by the District of Columbia Fire Marshal of the installation of newspaper vending machines within WMATA stations. Warrington Affidavit at ¶ 6. The Fire Marshal became concerned that newspaper vending machines would introduce a combustible element into the system. *See* Exhibit I to Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition Memorandum") (letter from John P. Breen, District of Columbia Fire Marshal to Theodore C. Lutz, General Manager, WMATA). Fire tests were subsequently conducted on two K–500 Sho-Rack vending machines. Thereafter, the Fire Marshal submitted a letter authorizing temporary placement of this type of vending machine for 120 days and prescribing conditions for permanent installation of the machines. *See* Exhibit J to Opposition Memorandum (recommendations of Fire Marshal Breen). The recommendations set forth in the letter were adopted by the Fire Chief's Committee of the Council of Governments in June, 1977. *See* Exhibit D to Opposition Memorandum.

According to WMATA's account, an agreement was reached pursuant to which WMATA relinquished its right to charge newspapers for placement of the racks in exchange for the publisher's agreement not to use hawkers once permanent vending racks were installed. *See* Warrington Affidavit at ¶ 7. The vending machines were subsequently installed in Metro station mezzanines in approved metal enclosures. The publishers paid for the fabrication and installation of the vendors and the manufacturers were not charged any rental. Warrington Affidavit at ¶¶ 7–8. To date, WMATA has permitted the installation of over 1500 newspaper vending machines representing approximately 60 different publications. *See* Affidavit of Ronald R. Rydstrom at ¶ 9.

### III. Background of the Use Regulation

Prior to 1980, WMATA's policy was not to permit "free speech" activities on its property. On March 27, 1980, the WMATA Board of Directors passed Resolution No. 80–19, the predecessor of the present Use Regulation. Resolution 80–19 for the first time permitted leafletting on WMATA property. The resolution contained several restrictions similar to those in the current Use Regulation, including the requirement to obtain a permit before engaging in free speech activities.

In response to increasing numbers of requests from groups seeking access to its facilities, a new regulation was proposed in 1986. After a public hearing in October, 1986, at which five witnesses testified, the proposed Use Regulation was modified and subsequently adopted. One of the five witnesses who testified at that hearing was Mr. Jake Terrell on behalf of *The Washington Post.* Neither Mr. Terrell nor any other witness offered any opposition to the prohibition on human vendors contained in the draft regulation. *See* Exhibit F to Opposition Memorandum.

The current Use Regulation, which expressly prohibits the sale of newspapers by human vendors, was adopted by WMATA's Board of Directors on January 15, 1987. Section 100.11(a) of the Use Regulation provides in part: "Because of safety and fire considerations, human vendors and the chaining of any newspaper vending machines to Authority property is prohibited." The Use Regulation essentially codified WMATA's longstanding policy regarding human vending of newspapers.

The Use Regulation also makes provisions for "free speech activity" subject to certain conditions.[1] The "free speech" activities permitted by the Use Regulation contain several significant limitations. The Regulation requires that all persons seeking to engage in free speech activity first obtain a permit from the Office of the General Counsel. *See* Exhibit G to Opposition Memorandum. WMATA retains the right to limit the number of persons permitted to engage in free speech activity on a station-by-station basis. Free speech activities are limited to the "above ground" areas in Metro stations. Such activities are also required to take place more than 15 feet from any escalator, stairwell, faregate, mezzanine, gate, kiosk, or farecard machine. Section 100.10(d).

### DISCUSSION

To determine whether the Post is entitled to a preliminary injunction, the Court must consider the four factors set forth in *Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921 (D.C.Cir.1958): (1) the plaintiff's likelihood of success on the merits; (2) whether plaintiff will incur irreparable injury in the absence of injunctive relief; (3) whether defendant will be injured by the issuance of a preliminary injunction; and (4) the public interest. *Id.* at 925.

### I. Success on the Merits

The Post advances two major theories as to why the Court should issue a preliminary injunction. First, the Post contends that WMATA's Use Regulation violates the Post's First Amendment rights. Second, the Post argues that the Use Regulation violates the Equal Protection Clause because it permits some forms of free speech, such as leafletting, but totally bans other forms of expression, such as the sale of newspapers by hawkers. Defendant, on the other hand, contends that the Use Regulation is a reasonable and content-neutral time, place, and manner restriction, which violates neither the First Amendment nor the Equal Protection Clause. Defendant also asserts the equitable defenses of estoppel and laches.

#### A. *First Amendment Challenge*

The Post argues that the absolute ban on newspaper hawking in WMATA's Use Regulation violates its First Amendment rights to freedoms of speech and press. The analysis of plaintiff's claim must proceed in three steps. First, the Court must inquire

---

**1.** Free speech activity is defined in section 100.-7(h) of the Use Regulation as "the organized exercise of rights and privileges which deal with political, religious, or social matters and are *non-commercial.*" (Emphasis provided.)

whether the regulated activity is protected by the First Amendment. If the activity is protected, the Court must then consider what type of forum is being regulated. Finally, the Court must consider whether the scope and proffered justification for the regulation satisfy the constitutional standards that are applicable to the type of forum. *See Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed. 2d 567 (1985).

### 1. *Protected Activity*

■ The Post claims that newspaper hawking is a protected First Amendment activity. The Court finds, however, that the Post defines the interest at issue here too narrowly. The interest implicated is that of circulating and distributing newspapers. "Hawking" is one of many manners in which a publisher can circulate and distribute its newspapers.

The Supreme Court has clearly held that circulation of newspapers is "constitutionally protected." *City of Lakewood v. Plain Dealer Publishing Co.*, — U.S. ——, 108 S.Ct. 2138, 2149–50, 100 L.Ed.2d 771 (1988).[2] Therefore, because WMATA's Use Regulation restricts in some degree the Post's ability to circulate and distribute newspapers, First Amendment concerns are implicated.

### 2. *Type of Forum*

The second inquiry, the type of forum involved, is highly controverted by the parties. The Supreme Court has recognized three types of fora: (1) the traditional public forum, such as a public street; (2) the public forum created by government designation; and (3) the nonpublic forum. *Frisby v. Schultz*, — U.S. ——, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). The resolution of this question is important because "the standard[s] by which limitations upon ... a [First Amendment] right must be evaluated differ depending on the character of the property at issue." *Perry Edu-*

cation Association v. Perry Local Educators' Association*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

In traditional public fora, the government may not prohibit all communicative activity.

> "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Carey v. Brown*, 447 U.S. 455, 461 [100 S.Ct. 2286, 2290, 65 L.Ed.2d 263] (1980). The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

*Id.* at 45, 103 S.Ct. at 955.

■ A state may also open public property for use by the public as a place for expressive activity, although the property is not a traditional forum. "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 45–46, 103 S.Ct. at 955.

The First Amendment, however, "does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). In a nonpublic forum, "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Assn.*, 460 U.S. at 46, 103 S.Ct. at 955.

---

2. The *City of Lakewood* Court made it clear that the Court should consider the general nature of the expressive activity—not the time, place, or manner of expression at issue. It is important in cases such as this to frame the issue properly. The issue here is *not* whether The Post has a

First Amendment right to hawk newspapers; the issue is whether The Post's First Amendment right to circulate newspapers can be restricted with respect to one manner of circulation, that of hawking newspapers.

■ Plaintiff argues that WMATA has converted its properties into public fora. Plaintiff argues that the Use Regulation which invites "free speech activities" makes this conclusion inescapable. Furthermore, plaintiff argues that the District of Columbia Circuit has held that WMATA has converted its subway stations into public fora by accepting some political advertisements for display. *See Lebron v. WMATA*, 749 F.2d 893, 896 (D.C.Cir.1984).

Defendant, on the other hand, argues that under *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court must look "to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* at 802, 105 S.Ct. at 3449. WMATA emphasizes the restrictive nature of its regulations permitting free speech activities. Defendant also argues that even if the Court were to find that the limited activities permitted rendered WMATA property a public forum, the property is only a public forum for the limited purposes permitted.

The Court finds that WMATA has converted its stations into public fora. Although the *Lebron* decision strongly supports the Court's present conclusion, *Lebron* is not dispositive. In that case, the Court of Appeals for the District of Columbia Circuit found that "WMATA has converted its subway stations into public fora by accepting other political advertising." 749 F.2d at 896. The Court, however, notes that WMATA's permitting political advertising does *not necessarily convert all* WMATA properties into public fora for all First Amendment purposes.

Nonetheless, the Court finds that WMATA clearly has opened its properties for use by the public as a place for expressive activity. Both Resolution 80–19 and the current Use Regulation, by their terms, mandate this conclusion. That WMATA has sought to limit the *extent* of free speech activities and to retain sufficient control over these activities to ensure that

safety is not compromised does not alter this determination.

### 3. *Scope/Proffered Justification*

Because the Court finds the property in question to be a public forum, the Court must consider first, whether the Use Regulation is content-neutral; second, whether the Use Regulation is narrowly tailored to serve a significant government interest; and third, whether it leaves ample alternative channels of communication. If these three criteria are met, the regulation is valid.

#### a. *Content–Neutral*

■ Plaintiff argues in a footnote that the regulation may not be content-neutral because special restrictions are placed upon newspapers on the basis of their subject matter. Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Memorandum") at 21 n. 50. The Court finds this argument unpersuasive.

WMATA's Use Regulation is content-neutral on its face. The Use Regulation does not distinguish between classes of prohibited and permitted speech. The Use Regulation does not single out speech of a particular content and seek to prevent its dissemination completely. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

#### b. *Alternative Channels of Communication*

■ Because the availability of alternate channels of communication is readily apparent, the Court considers this matter before proceeding to the more difficult question whether WMATA's Use Regulation is narrowly tailored. Plaintiff argues that the Use Regulation does not leave ample alternative channels of communication through which newspapers can be distributed on WMATA property. Plaintiff contends that the oral communication to passersby about important news stories cannot be accomplished through the use of a vending machine. Plaintiff also argues that vending

machines are incapable of holding enough newspapers to meet public demand; that they are incapable of providing change; that they are sometimes located in inconvenient places; and that the process of purchasing from a vending machine is inconvenient.

Defendant contends that plaintiff's arguments are illusory. Defendant argues that newspaper vending machines are capable of drawing attention to important news stories by showcasing front page headlines. Defendant further contends that the limited capacity of the machines is not a concern because distributors can refill any empty racks. Defendant also argues that newspapers are permitted to insert a change-making function in their vending machines and that change is provided by nearby WMATA farecard machines. Defendant contends that plaintiff has provided no empirical data that people would prefer to buy from a hawker than from a vending machine.

The Court finds the defendant's arguments persuasive. As discussed above, the interest at issue is the Post's right to distribute and circulate its newspapers on WMATA's property. Vending machines provide The Post with an adequate alternative means of exercising this right. Although newspaper vending machines are not without their problems, the First Amendment does not require defendant to use WMATA property to maximize plaintiff's newspaper sales.

The most important argument raised by plaintiff in this regard is that vending machines, due to their limited capacity, prevent plaintiff from reaching a substantial number of potential customers. Careful consideration of the facts in this case, however, demonstrates that plaintiff's concerns have not been convincingly demonstrated. At present, plaintiff owns over 100 vending machines in the interior of WMATA's Metrorail stations, as well as numerous exterior vending machines. *See* Rydstrom Affidavit at ¶ 10. The plaintiff's ability to refill empty vending machines appears to be unrestricted. Furthermore, it appears undisputed that since vending machines were approved for use on WMATA property, WMATA has never denied a request by The Post to place an interior vending machine in a WMATA station or an exterior vending machine outside of a WMATA subway station. *See* Rydstrom Affidavit at ¶ 8. Additionally, WMATA indicates that if plaintiff requested permission to place more vending machines either in the interior or at exterior locations of the Huntington or Silver Spring stations, approval of such requests would be recommended. *See* Rydstrom Affidavit at ¶¶ 12, 14. The Court finds, therefore, that WMATA's Use Regulation does not limit plaintiff's ability to reach a substantial number of potential customers. Accordingly, the Court finds that the Use Regulation leaves open adequate alternative channels of communication through which plaintiff can exercise its right to distribute and circulate its newspapers.

#### c. *Narrowly Tailored*

■ WMATA's Use Regulation "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). Plaintiff concedes that WMATA's stated rationales for the Use Regulation, namely safety and fire considerations, may qualify as "significant government interests" and thereby warrant some regulation of newspaper hawkers. Plaintiff argues, however, that these interests do not justify a total ban on newspaper hawking. *See* Plaintiff's Memorandum at 21–22. Plaintiff argues that many locations on WMATA property exist where newspaper hawking may be conducted without any adverse effect on safety or fire prevention. *See* Plaintiff's Memorandum at 23–24.

Plaintiff argues that the clearest proof that the Use Regulation is not narrowly tailored to the government's interest in safety is the fact that no practical difference exists between the risk presented by newspaper hawking and many of the free speech activities that WMATA permits. Plaintiff argues that leafletting and similar

activities carry the same attendant risks as newspaper hawking.

Defendant offers several arguments in support of its position that WMATA's Use Regulation is narrowly tailored. First, defendant contends that the risks attendant to newspaper hawking are substantially greater than those relating to leafletting or similar free speech activities. The defendant offers the affidavit of Robert W. Wood, Jr. ("Wood Affidavit"), the Manager of WMATA's Office of Safety and Fire Protection, in support of its assertions. Specifically, defendant argues that the risk presented by hawkers is more substantial than the risk presented by leafletters for several reasons. First, the presence of hawkers on WMATA property would necessarily mean the presence of stacks of newspapers; leafletters, in contrast, hand carry any materials they are distributing. Defendant argues that stacks of newspapers would introduce a combustible element into WMATA's system if hawking were permitted inside the station. *See* Wood Affidavit at ¶¶ 10, 11. Defendant argues that, even at an above ground location, a smoldering stack of newspapers would present a serious threat because vent shafts, fan shafts, and escalator shafts have the potential to draft smoke and because metrorail trains have a tendency to create a partial vacuum as they leave the station. *See* Wood Affidavit at ¶ 12. Defendant also argues that stacks of newspapers create the risk of patrons tripping. *See* Wood Affidavit at ¶¶ 13, 21. Additionally, such stacks could impede ingress or egress from an entrance in the case of an emergency. *See* Wood Affidavit at ¶¶ 14, 15. Defendant also asserts that newspaper stacks present an attractive target for vandalism by arson. *See* Wood Affidavit at ¶ 20. Defendant also argues that hawkers would increase the opportunity for crime because they carry the proceeds of their sales on their person. *See* Wood Affidavit at ¶ 19.

Defendant also argues that the Use Regulation expressly prohibits "shouting" and "outcries"—precisely the type of speech plaintiff contemplates. Defendant argues that this regulation is necessary because noise can prevent patrons and employees from hearing safety announcements. *See* Wood Affidavit at ¶ 24.

Defendant also contends that plaintiff's arguments on the issue of whether the Use Regulation is narrowly tailored are premised on an erroneous assessment of the risk because plaintiff considers only the risk presented by a single hawker at any given location. Defendant contends that if it was required to permit plaintiff to hawk newspapers, it would also be required to provide the same opportunity to the approximately 59 other publications which would claim the same rights as the plaintiff. Thus, the risk presented must be assessed as if *several* hawkers were present in a given location—not just an isolated hawker.

Finally, defendant argues that it is both reasonable and necessary, when dealing with issues concerning the safety of WMATA's workers and patrons, for WMATA to base its regulations on worst-case scenarios.

The Court finds no controlling case law directly in point. The Court does find three opinions of the United States Supreme Court instructive. The Court also considers one Second Circuit opinion which involved somewhat similar facts.

In *Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), the Supreme Court rejected a facial challenge to a local ordinance that completely banned focused picketing taking place in front of a particular residence. *Id.* at 2497–98, 2501, 2504. Although the forum in *Frisby* was a traditional public forum, *i.e.,* a public street, *id.* at 2500, and although the ban on picketing was a "complete ban of that particular medium of expression," *id.* at 2504, the Court nonetheless concluded that the ordinance was "narrowly tailored" to serve the significant government interest in the protection of residential privacy. *Id.*

Similarly, in *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court rejected a First Amendment challenge to an ordinance that completely banned the posting of signs on public property. Specifically, the Court accept-

ed "the City's position that it may decide that the esthetic interest in avoiding 'visual clutter' justifies a removal of signs creating or increasing that clutter." *Id.* at 816–17, 104 S.Ct. at 2135. *Taxpayers for Vincent* is distinguishable from *Frisby* and from the instant case, however, because the property involved in the former case was not a public forum. *See id.* at 813–15, 104 S.Ct. at 2133–34. Nonetheless, the Court's determination in *Taxpayers for Vincent* that the ordinance in question was narrowly tailored to serve a significant government interest, *see* 466 U.S. at 808–10, 104 S.Ct. at 2130–32, is useful in applying that principle to the facts of the present case.

Finally, in *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Supreme Court rejected a challenge to a Minnesota State Fair Rule which limited the sale or distribution of merchandise, including printed or written material, to designated spaces in a fairgrounds. The spaces were rented in a nondiscriminatory fashion to all comers on a first-come, first-served basis. 452 U.S. at 643–44, 101 S.Ct. at 2561–62. The Court held "that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *Id.* at 654, 101 S.Ct. at 2567.

The *Heffron* Court specifically rejected the Minnesota Supreme Court's determination that the challenged Rule was unnecessary because the State could avoid the threat to its interest by less restrictive means. *Id.* In this regard, the *Heffron* Court accepted an argument similar to one of the arguments raised by defendant in the instant case. Defendant Turner has argued that, in determining whether WMATA's Use Regulation is narrowly tailored, the Court should consider the safety risk resulting from the presence of several hawkers from different publications—not simply the risk presented by one hawker from The Post. In *Heffron*, the Court stated:

> [T]he inquiry must involve not only [respondent], but also all other organizations that would be entitled to distribute, sell, or solicit if the booth rule may not be enforced with respect to [respondent]. Looked at in this way, it is quite improbable that the alternative means suggested ... would adequately deal with the problems posed by the much larger number of distributors and solicitors that would be present on the fairgrounds if the judgment below were affirmed.

452 U.S. at 654, 101 S.Ct. at 2567.

The Court finds that these Supreme Court decisions collectively provide broad support for defendant's position that WMATA's Use Regulation is narrowly tailored to protect a significant government interest. On the other hand, however, the Court takes note of the Second Circuit's decision in *Wright v. Chief of Transit Police*, 558 F.2d 67 (2d Cir.1977). *Wright*, which supports plaintiff's position to some extent, involves facts which are closer to the facts of the instant case than any of the Supreme Court opinions discussed above.

In *Wright*, the Second Circuit reversed a District Court's decision to dismiss a complaint. Plaintiffs in that action, who were members of the Socialist Workers Party, had attempted to sell socialist newspapers in the New York City subway system by displaying their newspapers and by trying to engage interested persons in conversation regarding the content of the papers. 558 F.2d at 67. Transit Authority policemen informed plaintiffs that their activity violated Authority regulations. Plaintiffs subsequently brought suit seeking declaratory and injunctive relief under 42 U.S.C. § 1983 and the First Amendment.[3] After a

---

**3.** Plaintiffs in *Wright* initially sought a preliminary injunction against the ban on their sales activity. The district court denied a preliminary injunction and dismissed the complaint for lack of jurisdiction on the ground that defendants were not "persons" within the meaning of § 1983. *See* 558 F.2d at 67–68. The court of appeals reversed the district court's ruling ·on the jurisdictional issue, but affirmed the denial of a preliminary injunction. *See Wright v. Chief of Transit Police*, 527 F.2d 1262, 1263–64 (2d Cir.1976) (per curiam).

bench trial, the "district court ... dismissed plaintiff's complaint, finding, among other things, that 'plaintiff's conduct would interfere with the safety and convenience of the public.'" *Id.* at 68.

The Court of Appeals found that the district court had failed to consider whether the government's "concerns could be accommodated by reasonable regulations short of a complete ban on plaintiffs' activities or whether a complete ban was justified in light of a compelling state interest." *Id.* at 68. Accordingly, the Court of Appeals reversed the order of the District Court and remanded for further findings. *Id.* at 69.

The Court finds that the question of plaintiff's likelihood of success on the merits of this litigation turns on the question whether the Use Regulation is narrowly tailored to serve a significant government interest. The Court finds that under the existing case law and based on the evidence in the record, although there may be some merit to plaintiff's claim of a First Amendment violation, plaintiff has not demonstrated the requisite likelihood of success on the merits to warrant the issuance of a preliminary injunction.

### B. *Equal Protection Challenge*

■ Plaintiff also asserts that the Use Regulation violates the Equal Protection guarantees of the Fifth and Fourteenth Amendments. Plaintiff argues that the Use Regulation draws a distinction among the class of speakers because it totally bans one form of expression, *i.e.*, that of the sale of newspapers by hawkers. Plaintiff argues that the Regulation must therefore be drawn with precision to serve a compelling governmental interest; plaintiff contends that because less drastic means are available to achieve the Regulation's purpose, the law must be struck down. *See* Plaintiff's Memorandum at 27–29.

Defendant argues that no distinction is drawn among the class of speakers by its Use Regulation. Defendant asserts that newspapers, considered as a class of speakers, actually are afforded more opportunities than are available to any other class of speaker. Defendant argues that WMATA has provided newspapers with space for its vending machines free of charge, that the vending machines are conveniently located near farecard machines, and that the machines are available to WMATA's patrons at all hours the stations are open. Defendant notes that no similar opportunities are available to individuals for noncommercial free speech activities. Defendant argues that it has not drawn any distinction based on the class of speakers. Rather, it has made provisions for both classes of speakers subject to reasonable time, place, and manner regulations.

The Court finds that plaintiff does not have substantial likelihood of success on its claim that the Use Regulation violates the Equal Protection Clause. The only distinction drawn by the Use Regulation is between speech that is noncommercial and speech that is commercial. The Court is unaware of any controlling case law which holds that a regulatory distinction premised on whether speech is of a commercial or noncommercial nature is impermissible under the Equal Protection Clause.[4] On the contrary, "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980).

Aside from the distinction based on the commercial nature of the speech, WMATA's Use Regulation makes no distinction based on the class of speaker nor on the content of the speech. *See Carey v. Brown*, 447 U.S. 455, 459–60, 471, 100 S.Ct.

---

4. In other contexts, the Supreme Court has long permitted distinctions between commercial and noncommercial speech. As Justice White noted in his plurality opinion in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion), "[t]he extension of First Amendment protections to purely commercial speech is a relatively recent development in First Amendment jurisprudence. Prior to 1975, purely commercial advertisements of services or goods for sale were considered to be outside the protection of the First Amendment." 453 U.S. at 505, 101 S.Ct. at 2891.

2286, 2289–90, 2296, 65 L.Ed.2d 263 (1980) (holding that state statute which discriminates among pickets based on the subject matter of their expression violates the Equal Protection Clause of the Fourteenth Amendment); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 100, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (holding that ordinance which impermissibly distinguished between labor picketing and all other peaceful picketing violates the Equal Protection Clause).

WMATA historically has afforded newspapers substantially greater First Amendment rights than WMATA has afforded noncommercial speakers. It appears undisputed that both Resolution No. 80–19 and its successor, the current Use Regulation, were intended to "level the playing field" with regard to the exercise of First Amendment rights by different classes of speakers. Accordingly, the Court cannot conclude that the Use Regulation, which has both the purpose and effect of fostering the interests sought to be protected by the Equal Protection Clause, violates the Equal Protection Clause simply because absolute parity does not exist between commercial and noncommercial speakers.

## II. Irreparable Injury

■ Plaintiff contends that it will be irreparably injured absent a preliminary injunction. Plaintiff's argument is premised entirely on the theory that any continuing and direct abridgement of The Post's First Amendment rights constitutes irreparable injury. In support of its position, plaintiff refers the Court to language from Justice Brennan's plurality opinion in *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Aside from the alleged ongoing infringement of plaintiff's First Amendment rights, plaintiff directs the Court to no other injury plaintiff will incur if a preliminary injunction is not granted.

The Court finds one fatal flaw in plaintiff's argument, *i.e.,* plaintiff assumes the existence of a First Amendment violation. As the Supreme Court stated in *Taxpayers for Vincent,* "to say the [regulation] presents a First Amendment *issue* is not necessarily to say that it constitutes a First amendment *violation.*" 466 U.S. at 803–04, 104 S.Ct. at 2128 (emphasis in original) (*quoting Metromedia, Inc. v. San Diego,* 453 U.S. at 561, 101 S.Ct. at 2920 (Burger, C.J., dissenting)). As discussed above, the Court acknowledges that this case presents a First Amendment issue. The Court, however, cannot conclude at this juncture that the Use Regulation constitutes a violation of plaintiff's First Amendment rights. Accordingly, plaintiff has failed to demonstrate that any irreparable injury will result in the absence of a preliminary injunction.

## III. Harm to WMATA

■ Plaintiff argues that WMATA will not be harmed by the issuance of an injunction. Specifically, plaintiff argues that WMATA will still remain free to regulate the activities of hawkers as it presently regulates other free speech activities.

Defendant, on the other hand, argues that WMATA will be harmed. First, defendant argues that WMATA will be placed in the position of having to defend against any claim that could arise as a result of a safety related accident stemming from the presence of hawkers. Second, defendant argues that this Court lacks sufficient information at this stage regarding the need for safety that it cannot fashion an effective remedy.

The Court finds that a genuine possibility of harm to WMATA would exist if the Court were to grant plaintiff's request for a preliminary injunction. Although plaintiff claims that WMATA would remain free to regulate the activities of hawkers, an injunction would require clearly WMATA to permit hawkers to sell newspapers wherever space for free speech activities was available. WMATA's "control," therefore, would be effectively limited to regulating the number of hawkers at any given location. WMATA, however, would have no control over the very risks which defendant

contends would be created by the presence of newspaper hawkers.

At this stage of the proceedings, the Court must ascribe substantial weight to the affidavit of Roger W. Wood, who is responsible for overseeing all safety and fire protection programs at WMATA. It is Mr. Wood's opinion that the presence of newspaper hawkers on WMATA property present a substantial threat to the safety of WMATA's patrons. The bases for his opinion were reviewed *supra* at 411–412. Plaintiff has offered no evidence which refutes substantially Mr. Wood's conclusions.[5]

In the absence of any evidence to the contrary, the Court, at this juncture, must accept Mr. Wood's conclusion that the presence of newspaper hawkers would create a safety risk. Because WMATA would be required to defend against any claim which would arise from a safety-related accident resulting from the presence of newspaper hawkers on WMATA property, consideration of possible harm to WMATA does not support the issuance of a preliminary injunction.

### IV. Public Interest

■ Similarly, to the extent the issuance of an injunction may create a safety risk to WMATA patrons, the public interest considerations militate against the issuance of a preliminary injunction. Any slight increase in convenience to plaintiff's customers because of the ability to buy newspapers from a hawker instead of a vending machine does not outweigh the paramount concern of public safety.

### V. Estoppel/Laches

■ Defendant also raises the defenses of estoppel and laches. *See* Opposition Memorandum at 33–34. Defendant contends that the Post participated in reaching a reasonable arrangement whereby WMATA agreed to allow newspapers' vending machines on its property free of charge in exchange for newspaper publishers' agree-

ment not to persist in their demand for the sale of newspapers by hawkers. Although this agreement apparently was not written, defendant argues that plaintiff should be estopped from seeking equitable relief at this time after having reaped the benefits of that agreement for the past several years.

The Court finds defendant's estoppel argument unpersuasive. None of the elements of estoppel appear to be present in this case. *See Gallimore, Inc. v. Home Indemnity Co.*, 432 F.Supp. 434, 437 (W.D. Va.1977) (reviewing elements of estoppel).

■ Defendant also asserts that the doctrine of laches is applicable here because (1) there has been an unreasonable delay in bringing suit and (2) the party asserting the defense has been prejudiced by the delay. Defendant argues that WMATA's policy against hawkers, although only recently reduced to writing, has been in place and has been enforced for over 10 years. Defendant also argues that it "has been prejudiced because it continued to provide space free of charge for the uniform vending machines at stations as the system expanded." Opposition Memorandum at 34.

The Court also finds this argument unpersuasive. First, the Court cannot determine that plaintiff's delay in bringing suit was unreasonable in view of the fact that the use of newspapers hawkers apparently has been a regular subject of negotiation between plaintiff and WMATA. Second, even if the Court were to determine that plaintiff's delay in bringing suit was unreasonable, the evidence does not support that defendant has been prejudiced by the delay. Accordingly, the Court rejects defendant's defenses of estoppel and laches as independent bases for the denial of plaintiff's motion for preliminary injunction.

### CONCLUSION

Upon consideration of the factors set forth in *Virginia Petroleum Jobbers Assn. v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958), the Court finds that plaintiff is not entitled to a preliminary injunction. The Court

---

**5.** Plaintiff, of course, will have the opportunity to challenge Mr. Wood's conclusions and the

bases therefor at a full trial on the merits.

finds that although plaintiff's First Amendment claim may have some merit, plaintiff has not demonstrated the requisite likelihood of success for the issuance of a preliminary injunction. The Court finds plaintif's claim of an Equal Protection violation to be unpersuasive. The Court also finds that plaintiff has demonstrated no irreparable injury which will result in the absence of an injunction. On the other hand, the Court finds that harm to WMATA could be created by the issuance of an injunction. The Court also finds that the public interest in the safe operation of the public transportation system militates against the issuance of a preliminary injunction.

Additionally, the Court finds that the defenses of estoppel and laches asserted by defendant do not provide an independent basis for the denial of plaintiff's motion for a preliminary injunction. None of the elements of estoppel are present in this case. The doctrine of laches is not properly invoked because defendant has failed to demonstrate that the delay in bringing this suit was unreasonable and because defendant has failed to demonstrate that she was prejudiced by the delay.

A preliminary injunction is extraordinary relief which is not warranted in this case. Plaintiff does not seek to preserve the status quo; it seeks to alter it. Accordingly, the Court must deny plaintiff's motion for a preliminary injunction.